# In the United States Court of Federal Claims

No. 14-187C

(Filed December 19, 2014)

```
* * * * * * * * * * * * * *  *
BIO-MEDICAL APPLICATIONS      *
OF AQUADILLA, INC., et al.,   *
                              *
              Plaintiffs,     *
                              *
        v.                    *
                              *
THE UNITED STATES,            *
                              *
              Defendant.      *
* * * * * * * * * * * * * *  *
```

Underpayment Claim; Money-
Mandating Regulation; 38 C.F.R.
§ 17.56 (2008); RCFC 12(b)(1);
RCFC 12(b)(6).

*David T. Ralston, Jr.*, Washington, DC, for plaintiffs. *Lisa A. Estrada*, *Jay N. Varon*, *Frank S. Murray*, *Jennifer M. Forde*, Washington, DC, of counsel.

*John S. Groat*, United States Department of Justice, with whom were *Stuart F. Delery*, Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Steven J. Gillingham*, Assistant Director, *Phyllis Jo Baunach*, Senior Trial Counsel, *Joshua D. Schnell*, Trial Attorney, Washington, DC, for defendant. *Dennis Foley* and *Drew Cornacchio*, Department of Veterans Affairs, Washington, DC, of counsel.

_____

**OPINION**

_____

**BUSH**, *Senior Judge*.

The court has before it defendant's motion to dismiss this suit, which was brought pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States

Court of Federal Claims (RCFC).  Defendant's motion was filed May 5, 2014 and has been fully briefed, including sur-replies and extensive appendices.  Oral argument was neither requested by the parties nor deemed necessary by the court. For the reasons set forth below, defendant's motion is denied.

## BACKGROUND[1]

This suit contends that plaintiffs were underpaid for dialysis and related services (collectively, dialysis services) provided to veterans.  According to the complaint, plaintiffs are 234 outpatient dialysis treatment centers; the centers share an affiliation, through various ownership interests, with Fresenius Medical Care Holdings, Inc.  Plaintiffs therefore refer to themselves as the Fresenius Plaintiffs (hereinafter, Fresenius Plaintiffs or plaintiffs).

The dialysis services in question were provided to veterans who had obtained "beneficiary authorizations" from the Department of Veterans Affairs (VA).  Compl. ¶¶ 22-23.  According to plaintiffs, the correct payment amounts for these services should have been derived from a formula provided by 38 C.F.R. § 17.56 (2009), not rates provided by the fee schedule used by the Medicare program.[2]  The relevant time-period for plaintiffs' claims is for dialysis services provided from January 1, 2009 through February 15, 2011 (the Relevant Period). On February 15, 2011, substantive amendments to section 17.56 took effect; thus, plaintiffs present no underpayment claims for dialysis services provided after that date.

Defendant raises a number of challenges to plaintiffs' claims in its motion to dismiss.  Many of defendant's arguments presented here were rejected when

---

[1]/  The facts recited here are taken from the complaint and other filings and are undisputed unless otherwise noted.  Other than to determine the court's jurisdiction over this suit, the court makes no findings of fact in this opinion.

[2]/  The court prefers to rely on the 2008 edition of the Code of Federal Regulations, which was in effect for many of the landmark events of this controversy.  There do not appear to be any significant differences between relevant provisions of the 2008, 2009 and 2010 editions of the Code of Federal Regulations that were applicable when the dialysis services at issue in this suit were provided to veterans.  All citations to the Code of Federal Regulations herein are to the 2008 edition, unless otherwise noted.

presented to this court in another dialysis services underpayment case founded on 38 C.F.R. § 17.56. *DaVita, Inc. v. United States*, 110 Fed. Cl. 71 (2013). Although the government's position is fundamentally the same in the two suits, here the government's motion relies, in part, on authorities and arguments that were not discussed in detail in *DaVita*. In any event, the holding in *DaVita* is not binding authority in this case. *AINS, Inc. v. United States*, 365 F.3d 1333, 1336 n.1 (Fed. Cir. 2004), *abrogated on other grounds by Slattery v. United States*, 635 F.3d 1298 (Fed. Cir. 2011) (*en banc*).

## DISCUSSION

## I.     Standards of Review

### A.     RCFC 12(b)(1)

In considering the issue of subject matter jurisdiction, this court must presume all undisputed factual allegations in the complaint to be true and construe all reasonable inferences in favor of the plaintiffs. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988). However, plaintiffs bear the burden of establishing subject matter jurisdiction, *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (citing *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936)), and must do so by a preponderance of the evidence, *Reynolds*, 846 F.2d at 748 (citations omitted). If jurisdiction is found to be lacking, this court must dismiss the action. RCFC 12(h)(3).

The Tucker Act delineates this court's jurisdiction. 28 U.S.C. § 1491 (2012). That statute "confers jurisdiction upon the Court of Federal Claims over the specified categories of actions brought against the United States . . . ." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (*en banc*) (citations omitted). These include money damages claims against the federal government founded upon the Constitution, an act of Congress, a regulation promulgated by an executive department, an express or implied contract with the United States, or a claim for liquidated or unliquidated damages in cases not sounding in tort. *Id.* (citing 28 U.S.C. § 1491(a)(1)).

The Tucker Act concurrently "waives the Government's sovereign immunity for those actions." *Id.* The statute does not, however, create a substantive cause of action or right to recover money damages in the Court of Federal Claims. *Id.* "[T]o come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages." *Id.*

In other words, the source underlying the cause of action must be money-mandating, in that it "'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" *United States v. Testan*, 424 U.S. 392, 400 (1976) (quoting *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1009 (Ct. Cl. 1967) and citing *Mosca v. United States*, 417 F.2d 1382, 1386 (Ct. Cl. 1969)). If the provision relied upon is found to be money-mandating, the plaintiff need not rely upon a waiver of sovereign immunity beyond the Tucker Act. *Huston v. United States*, 956 F.2d 259, 261 (Fed. Cir. 1992) (citing *United States v. Mitchell*, 463 U.S. 206, 218 (1983)).

When the government has challenged the truth of jurisdictional facts in the complaint, the court must resolve the dispute. *Reynolds*, 846 F.2d at 747 (citations omitted). The court may inquire into evidence outside the pleadings to establish jurisdictional facts. *Id.*; *Rogers v. United States*, 95 Fed. Cl. 513, 514-15 (2010) (citations omitted). "Indeed, the court may, and often must, find facts on its own." *Martinez v. United States*, 48 Fed. Cl. 851, 857 (2001) (citing *RHI Holdings, Inc. v. United States*, 142 F.3d 1459, 1461-62 (Fed. Cir. 1998); *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991)), *aff'd in relevant part*, 281 F.3d 1376 (Fed. Cir. 2002).

## B.    RCFC 12(b)(6)

It is well-settled that a complaint should be dismissed under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). When considering a motion to dismiss brought under RCFC 12(b)(6), "the allegations of the complaint should be construed favorably to the pleader." *Scheuer*, 416 U.S. at 236. The court must not mistake legal conclusions presented in a complaint, however, for factual allegations which are entitled to favorable inferences. *See, e.g.*, *Papasan v. Allain*, 478 U.S. 265, 286 (1986) ("[W]e are not bound to accept

4

as true a legal conclusion couched as a factual allegation.") (citations omitted).

The court must also inquire whether the complaint meets the plausibility standard described by the United States Supreme Court, *i.e.*, whether it adequately states a claim and provides a "showing [of] any set of facts consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 (2007) (*Twombly*) (citations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*Iqbal*) (quoting *Twombly*, 550 U.S. at 570). Plausibility is a context-specific inquiry. *See, e.g.*, *Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.") (citation omitted).

## II. Analysis

### A. Introduction

#### 1. Administrative Incoherence

Unfortunately, the dispute before the court is more complicated and confusing than would be expected in what plaintiffs describe as a "simple and fairly straightforward . . . collections case." Pls.' Opp. at 6. Part of this confusion must be attributed to the codified medical regulations of the VA which, despite a sweeping overhaul in 1996, were littered with errors throughout the Relevant Period.[3] *See* 61 Fed. Reg. 21,964 (May 13, 1996) (re-codifying the VA's medical regulations in Part 17 of Title 38 of the Code of Federal Regulations); *see also, e.g.*, 38 C.F.R. § 17.120(a)(4) (referencing a non-existent 38 C.F.R. § 17.48(j)); 38 C.F.R. § 17.121 (citing for authority a non-existent 38 U.S.C. § 501(c)(1) (2006)); 38 C.F.R. § 17.142 (referencing non-existent regulations 38 C.F.R. §§ 17.99, 17.210). Further confusion is demonstrated by the parties' acknowledgment that

---

[3]/ Defendant contributes to this confusion by citing to a regulation which is not to be found in the 2008, 2009 or 2010 editions of the Code of Federal Regulations, or the current edition, for that matter. *See* Def.'s Reply at vii, 24 (citing to non-existent "38 C.F.R. § 7.21" and "38 C.F.R. § 17.21").

the applicable VA manual (Manual M-1) during the Relevant Period may not have reflected the provisions of the VA's medical regulations or, for that matter, actual administrative practices at the VA. *See* Pls.' Opp. at 24-25 & n.18 (noting inconsistencies between 38 C.F.R. § 17.56 and Manual M-1 (citing Pls.' App. at 108-09)); Def.'s Reply at 19 ("We do agree with plaintiffs that . . . there is evidence that VA officials did not follow the provisions of Manual M-1 governing payment for dialysis services and did not pay providers of dialysis services in accordance with the Medicare rates as directed by Manual M-1; our statement in our opening brief regarding the VA's practice should have reflected this fact."). Thus, part of this controversy arose from the VA's lack of coherence in its administration of payment for dialysis services in the years preceding the Relevant Period and during the Relevant Period.

## 2.      Ambiguities in the Government's Legal Arguments[4]

The government raises diverse arguments to attack this court's jurisdiction over plaintiffs' claims and to attack the sufficiency of certain claims presented in the complaint.  It is only with some difficulty, however, that the government's opening brief may be deciphered to separate the jurisdictional challenges from the RCFC 12(b)(6) challenges.  Neither the table of contents of the brief, nor the statement of questions presented, offers a clear demarcation of Rule 12(b)(1) and Rule 12(b)(6) arguments.

The primary focus of the government's reply brief is on this court's jurisdiction.  *See* Def.'s Reply at 1 ("Because plaintiffs fail to rebut our showing that no statute gave the VA authority to issue 38 C.F.R. § 17.56 (2009) as a money-mandating provision so as to repeal Federal procurement laws, and, for that reason, plaintiffs' claims are subject to the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109 [(2012)], this Court lacks jurisdiction over plaintiffs' complaint."), 25 ("For the reasons set forth in our moving brief and above, the Court should dismiss the complaint for lack of jurisdiction.").  However, as the court reads plaintiffs' opposition brief (to which defendant's reply brief was

---

[4]/  The court does not assign blame to the attorneys who worked on the government's briefs.  The legal issues are thorny and complex, and the government's position in this dispute resists any easy or straightforward explanation.  Although ultimately unpersuasive, the government's motion raised a number of skillful and well-supported arguments.

directed), plaintiffs attempt to rebut the government's jurisdictional *and* non-jurisdictional challenges to the complaint.  *See, e.g.*, Pls.' Opp. at 14 (asserting that "Plaintiffs more than carry their jurisdictional burden of establishing . . . that Section 17.56 can be fairly interpreted as mandating compensation for non-VA providers of authorized dialysis services.") (citations omitted); *id.* at 14 n.9 (responding to one of defendant's arguments that plaintiffs describe as a request for "dismissal of Plaintiffs' claims under RCFC 12(b)(6)"); *id.* at 47 n.43 (responding to one of defendant's arguments that, according to plaintiffs, does "not affect jurisdiction").  Given that defendant's reply brief presents no clearly identified RCFC 12(b)(6) arguments, it is difficult to discern whether the government's non-jurisdictional challenges to the complaint have been conceded to be infirm or whether these non-jurisdictional arguments are merely de-emphasized in defendant's reply and sur-reply briefs.

### 3.    Structure of the Court's Analysis

Despite the somewhat amorphous structure of defendant's opening brief and the ambiguity presented by the omission of any reference to RCFC 12(b)(6) arguments in defendant's reply brief, the court has attempted in this opinion to address all of the government's substantive arguments.  Because much of the government's jurisdictional challenge to the complaint rests upon its varied assaults on the interpretation and validity of 38 C.F.R. § 17.56, the court's jurisdictional analysis begins with a discussion of that regulation and the parties' arguments which focus on the regulation itself.  The court then turns to the government's other jurisdictional arguments concerning the impact of the Contract Disputes Act and other procurement statutes and regulations on plaintiffs' claims.  Finally, the court addresses the non-jurisdictional arguments presented by the government which appear to rely upon RCFC 12(b)(6).

### B.    Jurisdictional Challenge Focused on the Meaning and Validity of 38 C.F.R. § 17.56

#### 1.    Authorized Promulgation of Section 17.56 in 1998

##### a.    Payment Formula Established

The VA promulgated section 17.56 in 1998.  The rule was established

through formal notice-and-comment procedures.  *See* Payment for Non-VA Physician Services Associated with Either Outpatient or Inpatient Care Provided at Non-VA Facilities, 63 Fed. Reg. 39,514 (July 23, 1998).  The rule was, in relevant part, "intended to establish reimbursement consistency among federal health benefits programs to ensure that amounts paid to physicians better represent the relative resource inputs used to furnish a service, and to achieve program cost reductions."  *Id.*

From the outset, the rule provided a formula to calculate the proper payment for non-VA outpatient physician services.  One part of the formula addressed the VA's payment for physician services when those services were *not* listed on "Medicare's participating physician fee schedule." 38 C.F.R. § 17.56(a) (1999). The formula in those instances provided that:

> Payment under the 75th percentile methodology is determined for each VA medical facility by ranking all occurrences (with a minimum of eight) under the corresponding code during the previous fiscal year with charges ranked from the highest rate billed to the lowest rate billed and the charge falling at the 75th percentile as the maximum amount to be paid.

*Id.* § 17.56(c).  However, when the 75th percentile method could not be calculated due to the infrequency of a particular type of physician service billed to that medical facility, the VA would pay "the usual and customary rate if there are fewer than 8 treatment occurrences for a procedure during the previous fiscal year."  *Id.* § 17.56(a).

### b.    Sufficient Statutory Authority for Section 17.56

The court notes that 38 U.S.C. § 501 (1994) was cited as authority for the promulgation of section 17.56.  *See* 38 C.F.R. pt. 17 (1999) (noting that 38 U.S.C. § 501 provides authority for the VA's medical regulations, along with other more specific statutes); 63 Fed. Reg. 39,514, 39,515 (noting that section 501 provides authority for section 17.56); *see also* Pls.' Opp. at 18-21.  Defendant suggests that section 501 could not have provided sufficient authority for the promulgation of substantive regulations such as section 17.56, relying especially on *Chrysler Corp.*

*v. Brown*, 441 U.S. 281 (1979) and *Miller v. United States*, 294 U.S. 435 (1935). Def.'s Reply at 8-16. These cases are inapposite, but for different reasons.

*Chrysler* does not address the nature and text of 38 U.S.C. § 501 or any of its predecessor statutes. Instead, *Chrysler* discusses 5 U.S.C. § 301 (2012). As plaintiffs point out, 5 U.S.C. § 301 and 38 U.S.C. § 501 are different statutes with different purposes. Pls.' Sur-Reply at 8-9. Persuaded by plaintiffs' arguments in this regard, the court finds the analogy between 38 U.S.C. § 501 and 5 U.S.C. § 301 strained and therefore finds the holding of *Chrysler* to be of no value in this dispute.

*Miller*, on the other hand, discusses a statute which has significant parallels with the text of 38 U.S.C. § 501, and according to defendant, the 1918 statute discussed in *Miller* was a precursor of § 501. *See* Def.'s Reply at 14. The relevant portion of the statutory provision discussed in *Miller* is set forth as follows:

> That the director, subject to the general direction of the Secretary of the Treasury, shall administer, execute, and enforce the provisions of this Act [to authorize the establishment of a Bureau of War Risk Insurance in the Treasury Department], and for that purpose have full power and authority to make rules and regulations not inconsistent with the provisions of this Act, necessary or appropriate to carry out its purposes, and shall decide all questions arising under the Act, except as otherwise provided . . . . Wherever under any provision or provisions of the Act regulations are directed or authorized to be made, such regulations, unless the context otherwise requires, shall or may be made by the director, subject to the general direction of the Secretary of the Treasury. The director shall adopt reasonable and proper rules to govern the procedure of the divisions and to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits of allowance, allotment, compensation, or insurance provided for in this Act, the forms of

> application of those claiming to be entitled to such
> benefits, the methods of making investigations and
> medical examinations, and the manner and form of
> adjudications and awards[.]

Act of May 20, 1918, ch. 77, sec. 1, § 13, 40 Stat. 555, 555.  The relevant portions
of the text of section 501 contain similar, but not identical, instructions regarding
the regulatory powers of the Secretary of the Department of Veterans Affairs:

> (a) The Secretary has authority to prescribe all rules and
> regulations which are necessary or appropriate to carry
> out the laws administered by the Department and are
> consistent with those laws, including –
>
> (1) regulations with respect to the nature and extent of
> proof and evidence and the method of taking and
> furnishing them in order to establish the right to benefits
> under such laws;
> (2) the forms of application by claimants under such
> laws;
> (3) the methods of making investigations and medical
> examinations; and
> (4) the manner and form of adjudications and awards.
>
> (b) Any rule, regulation, guideline, or other published
> interpretation or order (and any amendment thereto)
> issued pursuant to the authority granted by this section or
> any other provision of this title shall contain citations to
> the particular section or sections of statutory law or other
> legal authority upon which such issuance is based.  The
> citation to the authority shall appear immediately
> following each substantive provision of the issuance.

38 U.S.C. § 501(a)-(b).  Whatever the parentage connecting the 1918 statute
amending the Bureau of War Risk Insurance's foundational legislation and section
501 governing the regulatory powers of the VA, the holding in *Miller* is not
directly applicable to the circumstances of the promulgation of section 17.56 for

10

the reasons discussed below.

*Miller* invalidated a regulation of the Bureau which attempted to replace a factual inquiry into the determination of an individual veteran's permanent disability with a formulaic definition of permanent disability. *See* 294 U.S. at 440 ("The vice of the regulation, therefore, is that it assumes to convert what in the view of the statute is a question of fact requiring proof into a conclusive presumption which dispenses with proof and precludes dispute."). Although a superficial reading of *Miller* might suggest that the Bureau lacked the power to create *any* substantive war risk insurance regulation based on the grant of regulatory authority cited above, a closer examination shows that the invalid regulation was improper because, in the view of the Supreme Court, it contradicted a specific statutory provision. A specific statutory provision of the Act of October 6, 1917 permitted claimants of war insurance benefits to bring suit in a United States district court if their insurance claim was denied. Act of October 6, 1917, Ch. 105, sec. 405, 40 Stat. 398, 410. When the regulation in question deprived the claimant of a factual inquiry into disability and replaced that inquiry with a regulatory definition of disability (in particular by equating the loss of one eye and one hand with disability), the regulation exceeded its statutory authorization. *Miller*, 294 U.S. at 439 ("It is not, in the sense of the statute, a regulation at all, but legislation.").

This closer reading of *Miller* suggests that the question, in this case, is not whether section 501(a)-(b), or its direct predecessor 38 U.S.C. § 210(c)(1) (1988),[5] gives the VA power to issue substantive regulations, the question is whether such substantive regulations conflict with statutes that govern the relevant activities of the VA. One example of this principle is found in *Gardner v. Brown*, 5 F.3d 1456 (Fed. Cir. 1993), *aff'd*, 511 U.S. 115 (1994). Citing *Miller*, the United States Court of Appeals for the Federal Circuit noted that a regulation limiting relief for disabilities resulting from VA medical treatment contravened a specific statute and was therefore invalid. *See Gardner*, 5 F.3d at 1464 ("The VA's desire to pay less compensation than Congress mandated could not authorize the extra-statutory legislation embodied in 38 C.F.R. § 3.358(c)(3) [(1992)]."). Thus, in *Gardner*,

---

[5] There are no substantive differences between § 501(a)-(b) and § 210(c)(1) because § 501 is merely the re-codification of its predecessor statutes. *See* Department of Veterans Affairs Codification Act, Pub. L. No. 102-83, 105 Stat. 378 (1991).

regulatory invalidity was based on a conflict with a specific statute, not on the VA's lack of authority to issue substantive regulations.

Although, as discussed *infra*, the government strives mightily to suggest that section 17.56 conflicts with certain statutes governing public contracting, the court has not found any conflict between section 17.56 and those statutes.  Thus, *Miller* and its progeny do not compel a finding that the promulgation of section 17.56 was infirm in any respect.  As to defendant's contention that section 501 is a mere housekeeping statute that does not permit the VA to issue substantive regulations, the court must disagree.  Courts have regularly noted the validity of regulations issued under the authority of section 501 and its direct predecessor 38 U.S.C. § 210(c)(1).  Section 210(c)(1), for example, has been referred to by the Federal Circuit as the VA's "more general authority to adopt regulations."  *Haas v. Peake*, 525 F.3d 1168, 1191 (Fed. Cir. 2008).  A substantive regulation based on this authority, concerning benefits for certain veterans experiencing non-Hodgkin's lymphoma, was accepted by the Federal Circuit as valid.  *Id.*

In another example, the VA's general regulatory power authorized a substantive regulation which defined "full-time study" for veterans' educational benefits.  *Wayne State Univ. v. Cleland*, 590 F.2d 627, 634 (6th Cir. 1978) ("The Administrator has the authority to issue regulations, pursuant to § 210(c)(1), which are consistent with any legislation administered by the V.A.").  Clearly, § 501 and its predecessor § 210(c)(1) are not mere housekeeping statutes.  The VA had the authority, under § 501, to promulgate section 17.56.  Defendant's attempt to invalidate its own regulation must fail.  *Cf. DaVita*, 110 Fed. Cl. at 83 ("The Government's effort to have the Court invalidate its own regulations is not well taken.") (citation omitted).

Finally, in a related attack on the validity of section 17.56, defendant argues that the regulation must pass a four-part test established by *Hamlet v. United States*, 63 F.3d 1097, 1105 (Fed. Cir. 1995) and *Brodowy v. United States*, 482 F.3d 1370, 1375 (Fed. Cir. 2007).  The court disagrees.  Plaintiffs' burden is to show that section 17.56 is a money-mandating provision of law.  *Huston*, 956 F.2d at 261 (citing *Mitchell*, 463 U.S. at 218).  The test in *Hamlet* and *Brodowy* establishes whether agency issuances of less formality than codified regulations may be money-mandating for purposes of establishing Tucker Act jurisdiction in this court.  The court declines to extend that doctrine, which is inapplicable to the

facts of this case, to create an acid test for the validity of regulations published in the Code of Federal Regulations.[6]

## 2. Valid Amendment of Section 17.56 in 2005

The parties agree that provisions of section 17.56 relevant to non-VA outpatient dialysis services were amended in 2005 and that the agency did not utilize formal notice-and-comment procedures because the VA viewed this amendment as a mere technical amendment. *See* Def.'s Mot. at 16-19; Pls.' Opp. at 21-26. The parties disagree, however, as to the significance of the 2005 amendment. Furthermore, if the court adopts plaintiffs' interpretation of the amended regulation, defendant insists that the 2005 amendment must have been procedurally invalid because the changes were substantive and the VA would have been required to issue the amendment through notice-and-comment rule-making. The court, for the reasons discussed *infra*, agrees with plaintiffs as to the meaning of the amended section 17.56 and as to the validity of the 2005 amendment.[7]

### a. Explaining the Applicability of the Payment Formula

As part of a revision of section 17.56 focused largely on non-VA health care professional services delivered in Alaska, a topic which was the subject of formal

---

[6] Defendant also briefly argues that section 17.56, as interpreted by plaintiffs, violates the Appropriations Clause of the United States Constitution. *See* Def.'s Mot. at 9 (citing U.S. Const. art. I, § 9, cl. 7); Def.'s Reply at 21-22. The government acknowledges that "Congress appropriated funds for the VA to acquire medical services for veterans, [but contends that] Congress did not authorize the VA to acquire medical services in a manner not subject to procurement laws." Def.'s Reply at 21. The court agrees with plaintiffs, as discussed below, that payments to plaintiffs pursuant to section 17.56 do not violate procurement laws. Defendant has failed to show how payments of funds pursuant to the formula established by section 17.56 offend the Appropriations Clause of the United States Constitution. *See* Pls.' Opp. at 32-33 (demonstrating that such payments for non-VA medical services have been part of the VA's budget authority for decades).

[7] The court notes that the VA, during the years prior to the Relevant Period and through much of the Relevant Period, appears to have shared plaintiffs' view of the 2005 amendment and its procedural validity. It is only as the VA prepared to amend section 17.56 in 2010-11 and responded to litigation that its position on the 2005 amendment of section 17.56 appears to have changed.

notice-and-comment rule-making, Def.'s Mot. at 16, the agency also revised the term in the regulation describing the services addressed by the payment provisions of section 17.56.  Payment for Non-VA Physician and Other Health Care Professional Services Associated With Either Outpatient or Inpatient Care Provided at Non-VA Facilities, 70 Fed. Reg. 5926, 5926 (Feb. 4, 2005).  This change was described as one of a "number of technical changes of a non-substantive nature":

> A number of technical changes of a non-substantive nature have been made in this final rule.  The proposed rule described the title of this rule as Payment for Non-VA Physician Services Associated with Either Outpatient or Inpatient Care Provided at Non-VA Facilities.  The use of the phrase "non-VA physician," both in the title of 38 CFR 17.56 and throughout the regulation, is imprecise, as the rule applies to all non-VA physician and other health care professional services associated with outpatient or inpatient care provided at non-VA facilities.  In order to reconcile the terminology used in this rule with common practice in VA, the phrase "non-VA physician" will be replaced with "non-VA health care professional services."  Additionally, the language was clarified to state the rates payable are based on the geographic location of where the services were rendered.

*Id.*  The change to section 17.56 relevant to this dispute is clear; the term "non-VA physician services" is replaced by "non-VA health care professional services" throughout the regulation.  *Id.* at 5927.

Plaintiffs argue, aided by evidence of VA payment practices from October 1, 2002 through June 2005, Pls.' Opp. App. at 107, as well as the VA's pronouncements in the Federal Register, 70 Fed. Reg. 5926, that the 2005 change was merely technical in nature because it reflected existing administrative practices at the VA.  Defendant, on the other hand, argues that the 2005 change was a "scrivener's error" that mistakenly eliminated important controls on the costs of non-VA health care professional services.  *See* Def.'s Mot. at 14

14

("Plaintiffs' overly literal reading of the 2005 change represents a scrivener's error and is directly contrary to policy makers' and drafters' clearly expressed intent."), 18 (arguing that by altering one provision in the regulation to include non-physician services, but failing to alter a payment formula provision relying on the Medicare "participating physician fee schedule" and not on a *number* of Medicare fee schedules, the VA lost the advantages of an important cost-containment mechanism).

Defendant's argument regarding a costly scrivener's error would be more persuasive if it were supported by *any* evidence of a dramatic change in payment practices at the VA after February 2005, or of VA recognition of such an error between February 2005, when the alleged error took effect, and the time when plaintiffs reminded the VA that the payment formula for dialysis services in section 17.56 was not governed by Medicare rates, in 2009.  The government, however, has cited none.  Based on this record, the court agrees with plaintiffs, and the VA pronouncement at the time of the amendment, that section 17.56 was amended in only a technical fashion to reflect payment practices for non-VA health care professional services.  Rather than interpreting section 17.56 to contradict its plain language, as the government appears to urge, the court interprets the amended regulation as commanding the use of the 75th percentile method of payment, or the usual and customary rate method, whenever the Medicare participating physician fee schedule did not apply to non-VA health care professional services provided during the Relevant Period.

### b.    No Substantive Change to the Agency's Application of the Payment Formula

Defendant argues that if plaintiffs' interpretation of the text is adopted, the 2005 amendment of section 17.56 "actually would change the VA's longstanding policy regarding compensation significantly."  Def.'s Mot. at 17.  The government appears to imply that such a significant change would have been substantive rule-making, not interpretive rule-making, and that the 2005 amendment was invalid for making substantive changes to payments for non-VA health care professional services in the absence of notice-and-comment rule-making.  *See id.* at 12 (noting that a valid regulation "'must have certain substantive characteristics and be the product of certain procedural requisites'" (quoting *Chrysler*, 441 U.S. at 301)); *see also* Def.'s Reply at 9 ("Substantive rules promulgated in the absence of

15

compliance with the procedures proscribed by Congress are void." (citing *Tunik v. Merit Sys. Prot. Bd.*, 407 F.3d 1326 (Fed. Cir. 2005))).  The court cannot agree that the 2005 technical change in section 17.56 was substantive rule-making.

Plaintiffs assert that the "VA's own records establish that the scope of Section 17.56 was not changed in 2005, for years prior to the February 2005 terminology change, the VA *already* had been paying non-VA dialysis providers in accordance with Section 17.56's "'75th Percentile" payment methodology.'" Pls.' Opp. at 22 (citation omitted).  Plaintiffs' assertion is supported by the evidence before the court, as noted *supra*.  For this reason, the court agrees with plaintiffs' statement that "Defendant's argument that the February 2005 change in Section l7.56's terminology represented a decisive and substantive change in VA payment policy that could only be accomplished via notice-and-comment rulemaking is untenable."  *Id.* at 26.

The court also agrees with plaintiffs that the VA's actions in 2005 and 2009 show that the VA rightly considered the 2005 technical change in section 17.56 to be merely interpretative, not substantive.  *Id.* at 27-29 & nn.22-23.  For all of the above reasons, the VA was not required to follow notice-and-comment procedures to replace the term "non-VA physician services" with "non-VA health care professional services" in section 17.56.  Because the promulgation of 38 C.F.R. § 17.56 (2008) has not been shown to have been procedurally invalid, defendant's attempt to discredit section 17.56 as a source of law upon which plaintiffs may rely must be rejected.

### 3.    Section 17.56 is Money-Mandating

There is little dispute that section 17.56 mandates payment for non-VA health care professional services pursuant to the payment formula contained therein.  *See* Pls.' Opp. at 16 ("Defendant appropriately does not attempt to claim that the language of Section 17.56 is anything but mandatory in terms of establishing the payment methodology by which Plaintiffs were to be paid.").  Defendant's attacks on the validity of section 17.56 are unsound, as discussed *supra*, and defendant's arguments that public contracting statutes conflict with section 17.56 are also unsound, as discussed *infra*.  The government cannot refute the fact that the text of section 17.56 introduces its payment formula provisions with the phrase "payment for non-VA health care professional services . . . *shall*

16

*be*." 38 C.F.R. § 17.56(a) (emphasis added).  This is mandatory language and therefore section 17.56 is money-mandating.  *DaVita*, 110 Fed. Cl. at 82.  Reliance by plaintiffs on a money-mandating source of law such as section 17.56 is sufficient to confer jurisdiction on this court.  *E.g.*, *Testan*, 424 U.S. at 401-02 (citation omitted).

> **C.   Defendant's Jurisdictional Challenge Asserting that 38 C.F.R. § 17.56 Contravenes Procurement Statutes, or that Plaintiffs Have Failed to Satisfy Jurisdictional Prerequisites of the Contract Disputes Act**

The government attempts to convince the court that the VA's payments for non-VA dialysis services during the Relevant Period were contractual in nature, and that statutes governing federal contracting and procurement practices prevent plaintiffs from recovering on their claims.  One focus of this jurisdictional challenge suggests that section 17.56 is in conflict with contracting statutes and thus, this regulation cannot be a valid, money-mandating source of law for plaintiffs' claims.  Another focus of the government's arguments is that each of the beneficiary authorizations issued by the VA was a unilateral contract accepted by performance.  A final focus of the government's arguments asserts that because the Contract Disputes Act (CDA) applies to the VA's arrangements for dialysis services identified in the complaint, plaintiffs, having failed to file claims with a contracting officer at the VA before filing suit in this court, have not fulfilled the jurisdictional prerequisite for a CDA suit in this court.  The court in *DaVita* rejected arguments of this nature, and the court must do so again here.  110 Fed. Cl. at 79-81.

> **1.   Section 17.56 Does Not Conflict with Applicable Federal Contracting Statutes**

> > **a.   Section 501 Provides Authority for a Non-Contractual Payment Scheme**

The first proposition that undergirds the government's contract-focused arguments is that the VA had no authority to pay for non-VA dialysis services other than its contractual authority:

> Consistent with the governing statutes, no VA official
> had any authority to obligate the United States as the
> result of any VA "non-contractual" acquisition of
> dialysis services. The inability of plaintiffs to meet their
> burden to establish that 38 C.F.R. § 17.56 (2009)
> constitutes a money mandating provision independent of
> the VA's contractual authority mandates dismissal of the
> complaint for lack of jurisdiction.

Def.'s Mot. at 11. This proposition is plainly wrong. First, as discussed *supra*, 38 U.S.C. § 501 provides sufficient authority for the money-mandating regulation 38 C.F.R. § 17.56. Second, nothing in the contracting statutes cited by the government forbids the VA from paying for non-VA health care professional services through a non-contractual mechanism.

Defendant cites, for example, 38 U.S.C. § 1703(a) (2012) and 38 U.S.C. § 8153 (2012) as the VA's express authority for the acquisition of non-VA medical services. Def.'s Mot. at 14. As plaintiffs point out, however, there is no indication in the evidence before the court that these statutes provide the authority for section 17.56(a)-(c), which sets forth the payment formula for obtaining non-VA dialysis services on a "fee-basis" for an authorized individual veteran, as opposed to the authority for entering into a contract for procuring non-VA dialysis services for any number of veterans referred to the provider, which is addressed in section 17.56(f). *See* Pls.' Opp. at 18-21 & n.15, 37-38. Further, plaintiffs note that the VA's medical regulations and other evidence show a "clear dichotomy" between the VA's contract mechanism for obtaining dialysis services and the VA's fee-basis mechanism.[8] *Id.* at 1-2, 19-20, 31-32, 42-44. Based on the record,

---

[8]/ Indeed, the history of section 17.56 and its amendments shows that the VA's payment formula was amended in 2000 to include a provision seeking to lower costs through negotiated contracts. VA Payment for Non-VA Public or Private Hospital Care and Non-VA Physician Services That Are Associated With Either Outpatient or Inpatient Care, 65 Fed. Reg. 66,636, 66,636 (Nov. 7, 2000) ("Sometimes VA can negotiate contracts with hospitals or physicians or with their agents to reduce the payment amounts."); Def.'s Mot. at 16 ("In 2000, the VA amended 38 C.F.R. § 17.56 (1999) to provide for lower payments based on negotiated contracts.") (citation omitted); Pls.' Opp. at 19 ("The VA's modification of Section 17.56 in 2000 to add the provision on *contract* pricing would have been necessary *only if* the VA recognized that Section 17.56, as adopted in 1998, already authorized the VA to obtain medical

the court does not agree with defendant that fee-basis payments for plaintiffs' non-VA health care professional services were contractual in nature or were authorized by 38 U.S.C. § 1703(a) or 38 U.S.C. § 8153.

Defendant also relies on 41 U.S.C. § 3101-4712 (2012) generally, and section 3101 in particular, to state that the VA cannot procure non-VA medical services through contracts unless it abides by procurement laws and regulations:

> The provisions of 41 U.S.C. §§ 3101-4712 mandate that the VA comply with the applicable Federal procurement statutes and regulations in purchasing and contracting for acquisition of medical services for veterans.  Section 3101 provides that "[a]n executive agency shall make purchases and contracts for . . . services in accordance with" the Federal acquisition statutes, 41 U.S.C. §§ 3101-4712, and implementing regulations.  Consistent with the mandate of section 310[1], sections 3101-4712 thus apply generally to all purchases and contracts by executive agencies in the absence of a specific statutory exclusion.

Def.'s Mot. at 8 (citations omitted).  The court has found, however, that the VA's payments during the Relevant Period, made pursuant to section 17.56(a)-(c) for fee-basis dialysis services, were *not* contractual in nature, thus rendering the procurement laws and regulations cited by defendant irrelevant to plaintiffs' claims.  In addition, the court does not read the general language of 41 U.S.C. § 3101, directing that agencies "shall make purchases and contracts for property and services" in accordance with procurement laws and regulations, to foreclose the VA from issuing beneficiary authorizations pursuant to 38 U.S.C. § 501 and 38 C.F.R. § 17.56.

### b.    Even if Section 501 Did Not Authorize Non-Contractual Payments for Non-VA Health Care

---

services for VA beneficiaries on a *non-contract* basis . . . .").  This regulatory context supports plaintiffs' view that payments for non-VA health care professional services occurred through two channels   contractual and non-contractual.  *DaVita*, 110 Fed. Cl. at 80-81.

**Professional Services, Acquiescence by Congress Apparently Validated Section 17.56 and Its Non-Contractual Payment Formula**

Should the court have erred as to the validity of section 17.56, relied upon by plaintiffs as a money-mandating regulation authorized by 38 U.S.C. § 501, the court finds, in the alternative, that the payment formula in 17.56 was apparently acquiesced to by Congress.  As a preliminary matter, defendant argues that the standard for congressional *ratification* of agency practices has not been met here. Def.'s Reply at 23; Def.'s Sur-Reply at 2-3 & nn.1-2.  Plaintiffs counter that

> when Congress expressly appropriated funds to the VA for fee basis medical services, it knowingly *authorized* the VA to use non-contractual means to deliver non-VA medical care to veterans during the Relevant Period . . . . Therefore, to the extent Defendant continues – in the face of the objective evidence to the contrary – to contend that the VA's use of non-contract, money-mandating procedures to facilitate the delivery of non-VA medical services to veterans was "unauthorized" by Congress, the record establishes the predicates necessary for "ratification by appropriation" even under the authorities cited by Defendant in its Reply. . . .  Thus, even were Defendant correct that the use of non-contract means to pay for fee basis medical services was somehow "unauthorized" under prior statutory authority, there is abundant evidence that Congress ratified that practice.

Pls.' Sur-Reply at 7-8.

The standard to establish congressional ratification of unauthorized agency action is not easy to meet.  *See Schism v. United States*, 316 F.3d 1259, 1293 (Fed. Cir. 2002) (*en banc*) ("[T]o demonstrate congressional ratification though appropriation statutes, the statute 'must plainly show a purpose to bestow the precise authority which is claimed.'" (quoting *Ex parte Endo*, 323 U.S. 283, 304 n.24 (1944))).  *Schism* holds that "in order for ratification to occur the

20

appropriation act itself must show a purpose to bestow the precise authority claimed and previously lacking." *Id.* at 1290 (citing *Endo*). Although there is substantial evidence in the record that Congress was aware of fee-basis, non-contractual payments to health care providers pursuant to the mechanism set forth in section 17.56(a)-(c), plaintiffs have not cited to any appropriations act which directly addresses the authority of the VA to make such payments. The court agrees with defendant that Congressional ratification of section 17.56(a)-(c) has not been demonstrated by plaintiffs.

Congressional acquiescence to an agency's long-standing interpretation of a codified regulation appears to be another matter. As the Federal Circuit has explained, "[t]he doctrine of acquiescence is premised upon Congress' failure to act in response to an action it might view as previously unauthorized, unlike the ratification context where Congress affirmatively acted to demonstrate its approval of an agency action." *Schism*, 316 F.3d at 1294-95 (citations omitted). Although mere legislative silence is not enough, evidence of extensive congressional awareness of administrative practices and evidence of consideration of legislation addressing the agency's regulatory practices may be enough to show acquiescence. *See id.* at 1295-96 (citing authorities). The congressional acquiescence doctrine has supported a number of decisions of the Supreme Court and the Federal Circuit. *See Disabled Am. Veterans v. Sec'y of Veterans Affairs*, 419 F.3d 1317, 1322-23 (2005) (citing cases). *But see Schism*, 316 F.3d at 1295 ("Nevertheless, the Supreme Court has repeatedly cautioned against using congressional silence alone to infer approval of an administrative interpretation.") (citing cases).

Having considered a number of these precedential cases, the court believes that if Congress did not provide authority for section 17.56 through 38 U.S.C. § 501, it apparently acquiesced to non-contractual payments for non-VA health care professional services for veterans before and during the Relevant Period. Plaintiffs have presented a number of documents showing congressional awareness, during the Relevant Period, of the VA making non-contractual payments to providers of medical services to veterans. *See* Pls.' Sur-Reply App. Tabs 1-3 (including a Government Accountability Office (GAO) Report to the Subcommittee on Oversight and Investigations, Committee on Veterans' Affairs, House of Representatives; a hearing report produced by that Subcommittee; and, another hearing report produced by the House Committee on Veterans' Affairs). The VA's Office of Inspector General (OIG) circulated a report to the House and

Senate Committees on Veterans' Affairs which also made Congress aware of the non-contractual payments being made by the VA around the time of the 2005 amendment to section 17.56.  Pls.' Opp. App. at 101, 104, 106, 108, 117.  A similar OIG report in 2009 again informed both the House and Senate Committees of non-contractual payments made by the VA for non-VA health care professional services.  *Id.* at 145, 155-56, 169, 171-72, 191, 194.

Not only was Congress extensively aware of the VA's interpretation of section 17.56 and its non-contractual payments for non-VA health care professional services, Congress actively considered non-VA health care services to be one of the important aspects of health care for veterans it addressed by legislation in the years immediately following the promulgation of section 17.56.  In 1999, for example, in the Veterans Millennium Health Care and Benefits Act, Pub. L. No. 106-117, Title I, § 111, 113 Stat. 1545, 1553-56 (1999), now codified at 38 U.S.C. § 1725 (2012), the VA was instructed to reimburse non-VA hospitals for the emergency care of veterans, under certain conditions.  In the Veterans Health Care, Capital Asset, and Business Improvement Act of 2003, Pub. L. No. 108-170, Title I, § 105, 117 Stat. 2042, 2045, now codified at 38 U.S.C. § 1720(c)(1) (2012), Congress lessened reporting requirements for providers of non-VA nursing home care.  In the Veterans Health Programs Improvement Act of 2004, Pub. L. No. 108-422, Title VI, § 601, 118 Stat. 2379, 2396, now codified at 38 U.S.C. § 1703(d)(1)-(4), the VA was instructed to conduct audits of contracting for non-VA health care services.

Given the bipartisan support for veterans' health care in general, it would be of little use to recount all of the legislative attention paid to this aspect of the VA's mission from 1998, when section 17.56 was promulgated, to 2011, when an amendment to that regulation changed the payment formula for non-VA health care professional services.  In just six months in 2003, for example, at least four bills were introduced in the Senate that proposed substantive changes to health care services for veterans.  Def.'s Mot. App. at 46-47.   It is clear that Congress continued to address non-VA health care services after the 2005 amendment of section 17.56 and during the Relevant Period.  In the Veterans' Mental Health and Other Care Improvements Act of 2008, Pub. L. No. 110-387, Title IV, § 402, 122 Stat. 4110, 4123-24, now codified in various subsections of 38 U.S.C. §§ 1725, 1728 (2012), longer periods of emergency care treatment were covered for veterans in non-VA facilities.  In the Act of February 1, 2010, Pub. L. No.

111-137, § 1, 123 Stat. 3495, 3495-96 (2010), now codified in various subsections of 38 U.S.C. § 1725, Congress removed certain barriers to VA reimbursement for emergency care in non-VA facilities for veterans who had other health insurance. All of this legislative activity shows that Congress continually addressed non-VA health care for veterans, and the VA's payments for such care, without disturbing the VA's interpretation and application of the payment formula in section 17.56. In these circumstances, the court finds that Congress appears to have acquiesced to section 17.56 even if 38 U.S.C. § 501 did not provide sufficient authority for the VA to issue and amend that regulation. *See Disabled American Veterans*, 419 F.3d at 1322 (holding that "congressional inaction in the face of long-standing agency practice can rise to the level of implied adoption").

### 2.    Payments to Plaintiffs Were Not Contractual in Nature

Defendant strives to convince the court that the authorizations issued by the VA pursuant to section 17.56 were contractual in nature.  Defendant relies first on certain contracting regulations that should, in its view, apply to the VA's reimbursement of non-VA health care professional services provided to veterans. Next the government relies on general principles of contract law to argue that the beneficiary authorizations for these services were in fact unilateral contracts accepted upon performance.  Both of these contractual analyses are infirm.

### a.    Regulations Specifically Pertaining to Contracting by the VA

The parties do not dispute that the Federal Acquisition Regulation (FAR) and the VA's supplemental acquisition regulations (VAAR) apply to VA procurements.  According to plaintiffs, however, these regulations have no applicability to the fee-basis beneficiary authorizations issued under sections 17.52 and 17.56 during the Relevant Period:

> Defendant . . . never establishes that the individual authorizations at issue in the Complaint were actually issued and administered as procurement contracts in accordance with the FAR and VAAR procurement regulations.  Defendant fails to do so because it cannot. Put simply, the VA did not issue or administer the

23

> authorizations in controversy here as FAR- and
> VAAR-based procurement contracts, and Plaintiffs'
> claims do not rely on procurement law in any way.
> Certainly, that a series of procurement regulations
> governs federal agency procurement contracts does not,
> *ipso facto*, render the authorizations at issue in this
> Complaint procurement contracts themselves.  For
> Defendant's invocation of FAR and VAAR to succeed
> here, Defendant must demonstrate how those
> procurement regulations apply here.  Defendant cannot
> make that showing because the prelitigation record is
> clear that the authorizations are not "procurement
> contracts" –  and they cannot be self-servingly recast as
> such by Defendant now.

Pls.' Opp. at 34.

The court agrees with plaintiffs that nothing in the record shows that the dialysis services at issue in this suit were obtained through contracting pursuant to the FAR or the VAAR.  Defendant argues that it does not matter what the VA used for procedures – its own procurement regulations could nonetheless apply.  *See* Def.'s Reply at 19-20 ("As we demonstrate, the VA's apparent assumption *sub silentio* that procurement laws did not apply to its acquisitions of non-VA medical services and its practices have no bearing upon the legality of those practices, which are therefore not entitled to . . . deference.").  As discussed below, the court finds that the regulations cited by defendant have not been demonstrated to have applied to the dialysis services provided by plaintiffs during the Relevant Period.

Three VAAR regulations are cited by defendant in its opening brief as evidence that the beneficiary authorizations at issue here were contractual.[9]  The first is 48 C.F.R. § 801.670-3, Def.'s Mot. at 19, 38, which states in relevant part that:

> When medical, dental, and ancillary services under

---

[9]/  All citations here to the VAAR are to the 2008 version of Chapter 8 of Title 48 of the Code of Federal Regulations.

> $10,000 per authorization are not available from an
> existing contract or agreement, the following VA
> officials at VA medical facilities may authorize these
> services[.]

VAAR 801.670-3(a).  The second regulation is 48 C.F.R. § 813.307(c), Def.'s
Mot. at 34, which states in relevant part that:

> The contracting officer or other properly delegated
> official (see 801.670-3) may use the following order
> forms when ordering the indicated medical, dental, and
> ancillary services totaling up to $10,000 per
> authorization when such services are not available under
> existing contracts:
> . . . .
> (2) VA Form 10-7079

VAAR 813.307(c) ("Forms").  It is undisputed that VA Form 10-7079 was the
form used to order dialysis services from plaintiffs during the Relevant Period.
The third regulation cited by defendant is 48 C.F.R. § 853.213, Def.'s Mot. at 19,
which states in relevant part that VA Form 10-7079 is "for obtaining indicated
medical and dental services within the limitations prescribed in 813.307."  VAAR
853.213.  This third regulation has for a title "Simplified Acquisition Procedures,"
in VAAR Subpart 853.2, "Prescription of Forms."

Although these regulations, taken together, show that the VA *may* use VA
Form 10-7079 when acquiring medical services for veterans in some type of
simplified acquisition permitted by its contracting procedures, the court must
agree with plaintiffs that no such contracting procedure was followed here.  *See*
Pls.' Opp. at 33-41.  In the government's reply brief, further reference to the
regulatory framework specific to VA contracting is provided:

> As a matter of law, VA's publication of . . . 48 C.F.R.
> § 801.601(c) placed plaintiffs on notice that VA
> individual authorizations were issued pursuant to the
> VA's contractual authority and were subject to
> procurement laws and a limitation of $10,000 for each

25

> authorization. . . .  While, for the purposes of this
> motion, we do not dispute that VA officials appear to
> have acted in a manner inconsistent with procurement
> laws, plaintiffs had notice of restrictions on VA officials
> to obligate the United States as a matter of law.

Def.'s Reply at 24 (citations omitted).  This VAAR section fails to advance the government's argument because it merely states a general limitation on VA employees' authority to obligate contract funds:

> An individual may not commit the Government for
> purchases of supplies, equipment, or services unless the
> individual has received delegated contracting authority
> as a contracting officer or purchase card holder or as
> provided in 801.670.  Individuals making such
> commitments or acting beyond the scope of their
> authority may be held financially liable.

VAAR 801.601(c).  Having considered both the regulatory provisions relied upon by defendant in the VAAR, as well as the extensive documentation of the VA's practice of issuing non-contractual authorizations under sections 17.52 and 17.56, the court concludes that nothing in the VAAR citations provided by defendant applied to the beneficiary authorizations at issue in this suit.

### b.    Unilateral Contract Theory

The government buttresses its contract-formation theory by construing VA Form 10-7079 beneficiary authorizations as invitations to enter into contracts with the VA.  In essence, defendant's theory asserts that each authorization issued to each individual veteran receiving the dialysis services identified in the complaint was a unilateral contract that was accepted upon the provision of the dialysis services.  Def.'s Mot. at 29-31.  Defendant relies on FAR provisions, caselaw and the Restatement (Second) of Contracts to support this theory.  *Id.* at 5, 29-31.  The court does not find these authorities applicable to this case, where the payment relationship between the VA and plaintiffs was governed by section 17.56 and lacked any indicia of the VA's intent to contract or of VA procurement activity.

### i.    FAR Provisions

First, the court examines the FAR provisions relied upon by defendant.[10] The two regulations primarily cited by the government are FAR 2.101 and FAR 13.004.  FAR 2.101, in relevant part, defines "contract" to mean

> a mutually binding legal relationship obligating the seller to furnish the supplies or services (including construction) and the buyer to pay for them.  It includes all types of commitments that obligate the Government to an expenditure of appropriated funds and that, except as otherwise authorized, are in writing.  In addition to bilateral instruments, contracts include (but are not limited to) awards and notices of awards; job orders or task letters issued under basic ordering agreements; letter contracts; orders, such as purchase orders, under which the contract becomes effective by written acceptance or performance . . . .

48 C.F.R. § 2.101.  This definition of contract is provided for the purposes of the FAR and federal acquisitions:  "A word or a term, defined in this section, has the same meaning throughout this regulation ([FAR] chapter 1) . . . .  *Id.* § 2.101(a).

Although the court must agree with defendant that, pursuant to FAR 2.101, a purchase order might present a unilateral contract accepted upon performance, and that, in another context, the general type of authorization form used by the VA might be construed as a purchase order, these concepts do not apply in this case.  First, as plaintiffs argue, the VA gave no indication that it considered its Form 10-7079 authorizations to be purchase orders within the meaning of FAR 2.101.  *See* Pls.' Opp. at 34 (stating that "the VA did not issue or administer the authorizations in controversy here as FAR- and VAAR-based procurement contracts").  Second, the VAAR does not include VA Form 10-7079 among the forms specifically identified as purchase orders.  *Compare* VAAR 813.307(a), *with* VAAR 813.307(c).  Third, as noted above and discussed more fully below,

---

[10]/  All citations here to the FAR are to the 2008 version of Title 48 of the Code of Federal Regulations.

the VA's payments for the dialysis services identified in the complaint in this case were not contractual in nature and were not subject to the FAR.  *See DaVita*, 110 Fed. Cl. at 84 ("VA authorizations issued to individual veterans for dialysis treatment are not contracts . . . .").

The other regulation relied upon by defendant is FAR 13.004, "Legal effect of quotations," which states in relevant part that:

> A quotation is not an offer and, consequently, cannot be accepted by the Government to form a binding contract. Therefore, issuance by the Government of an order in response to a supplier's quotation does not establish a contract.  The order is an offer by the Government to the supplier to buy certain supplies or services upon specified terms and conditions.  A contract is established when the supplier accepts the offer.

48 C.F.R. § 13.004(a).  It is difficult to understand how the government wishes the court to apply this regulation to the beneficiary authorizations and payments for dialysis services at issue in this case, because the government has identified no "quotations" that triggered the VA Form 10-7079 authorizations for dialysis services.[11]  It is also difficult to comprehend how Part 13 of the FAR, which governs "Simplified Acquisition Procedures," could be applicable to this dispute, when so many other applicable FAR provisions, in Part 13 and elsewhere in the FAR, were ignored by the government if the beneficiary authorizations were indeed to be construed as simplified acquisitions under the FAR.  *See* Pls.' Opp. at 36-41.

In sum, the court finds the FAR provisions cited by defendant to be unavailing in the government's attempt to convert the VA's authorizations for dialysis services into contracts.

---

[11]/  Indeed, the Armed Services Board of Contract Appeals decision relied upon by the government to illustrate FAR 13.004, Def.'s Mot. at 29, clearly involves an actual purchase order issued in response to a price quotation from a supplier.  *See Friedman Enters.*, ASBCA No. 54886, 05-2 BCA ¶ 32991 (June 3, 2005).

### ii.    Caselaw

The government relies, primarily, on two cases for its contention that the VA's beneficiary authorizations for dialysis services presented unilateral contracts accepted by plaintiffs.  The first is *Bel Pre Health Care Ctr., Inc. v. United States*, 24 Cl. Ct. 495 (1991), *aff'd*, 980 F.2d 745 (Fed. Cir. 1992) (table).  The quoted excerpts from *Bel Pre* are, at first glance, helpful to defendant's position in this case:  "'VA Form 10-7078 [essentially the equivalent, for inpatient services, of VA Form 10-7079, which is for outpatient services] – Authorization and Invoice for Medical and Hospital Services is essentially a purchase order for procurement' which 'when issued, obligate[s] the Government to pay only for the amount of services requested and performed.'"  Def.'s Mot. at 30 (quoting *Bel Pre*, 24 Cl. Ct. at 497).

As plaintiffs point out, however, an underlying, formal contract purchasing nursing home services for thirty veterans was at issue in *Bel Pre*.  24 Cl. Ct. at 496.  The beneficiary authorizations in that case were examined by the court to see if the authorizations, also issued by the VA, provided an additional "enforceable obligation" not found in the formal contract's terms.  *Id.* at 497.  In the end, the formal contract's express terms dictated the resolution of the parties' dispute, despite any "definiteness" of those express terms that may have been provided by the additional VA authorization forms.  *Id.* at 497-98.

Here, there is no allegation that the beneficiary authorization forms issued by the VA to plaintiffs defined the terms of an underlying contract for services; indeed, the opposite is the case.  *See* Compl. ¶¶ 2-3; Pls.' Opp. at 35 n.31 ("In contrast to the scenario in *Bel Pre*, Defendant does *not* assert that the authorizations at issue in the Complaint were ordering instruments under established procurement contracts between the VA and the Plaintiffs.").  For that reason, *Bel Pre* is readily distinguishable from this case and the contract analysis in *Bel Pre* is of no value in this dispute.  The court concludes that the contract analysis in *Bel Pre* cannot convert the VA beneficiary forms at issue here into purchase orders.

Defendant also relies on the Federal Circuit's contract analysis in *Wesleyan Co. v. Harvey*, 454 F.3d 1375 (Fed. Cir. 2006).  The court notes, first, the following facts that distinguish *Wesleyan* from this case.  There was no regulation

in *Wesleyan* that provided the payment rate for the Army's purchase orders, as is the case for the VA's beneficiary authorizations in this case. In addition, the six purchase orders at issue in *Wesleyan* were issued by the Army to one specific company for multiple prototypes of the same water filtration systems; here, authorizations were provided to numerous individual veterans to obtain dialysis services from 234 providers.

In *Wesleyan*, the appeals court offered this analysis of the Army's purchase orders:

> The purchase orders . . . involve the exchange of property for money, and thus involve "procurement.". . . The purchase orders specify the parties involved, delivery instructions, price, payment terms, and transportation instructions. No essential term is missing. Although Wesleyan did not sign the purchase orders, it performed, which clearly signals acceptance. Taken together, the purchase orders and Wesleyan's performance contain all essential contract terms and demonstrate mutual assent to a procurement contract.

454 F.3d at 1378-79 (footnote omitted). The Federal Circuit noted that there had been more communications between the company and the Army than just the bare language of the six purchase orders: "The complete exchange between the parties is no doubt even more robust than the information contained in the record. For example, oral discussions are referenced on the purchase orders, and the record does not include the content of those discussions." *Id.* at 1379 n.4. In this case, there is no allegation in the complaint of oral discussions referenced in the text of beneficiary authorizations issued by the VA.

*Wesleyan* thus stands for the proposition that where the government is the buyer and a company is the seller, a purchase order met with performance is adequate to form a procurement contract. *See* 454 F.3d at 1379 ("This purchasing activity was sufficient to transform the Army's relationship with Wesleyan from that of evaluator and bidder to that of buyer and seller."). In the court's view, however, it would be wrong to extend this holding to situations where a document that superficially resembles a purchase order is used by the government to

30

authorize benefits for individual veterans.  Although *Wesleyan* supports the government's view that certain types of documents, met with performance, are sufficient to form a procurement contract, there are too many factual dissimilarities between *Wesleyan* and this case to infer that a procurement contract was formed when plaintiffs provided dialysis services to veterans equipped with beneficiary authorizations.

In sum, the court does not find that the government's cited cases compel a finding that the VA's beneficiary authorizations were unilateral procurement contracts accepted upon performance.  *Accord DaVita*, 110 Fed. Cl. at 80 ("The statutory and regulatory framework governing the provision of medical services to veterans establishes that the authorizations at issue are not contracts.  Rather, authorizations are separate instruments to be used when a particular medical service is not available under an existing contract.").

### iii.    Restatement (Second) of Contracts

Finally, the government seeks support from a section of the Restatement (Second) of Contracts titled "Option Contract Created by Part Performance or Tender."  Restatement (Second) of Contracts § 45(1) (1981).  The text cited by defendant, Def.'s Mot. at 30, explains that

> [w]here an offer invites an offeree to accept by rendering a performance and does not invite a promissory acceptance, an option contract is created when the offeree tenders or begins the invited performance or tenders a beginning of it.

Restatement (Second) of Contracts § 45(1).  Defendant does not explain how such a general principle of contract formation applies to federal procurement contracts, or to VA beneficiary authorizations specifically.  Instead, defendant cites generally to a number of cases and decisions which are not binding on this court, Def.'s Mot. at 31, with little analysis as to the import or persuasiveness of these decisions.  Having studied the illustrations provided with the Restatement (Second) of Contracts § 45 (none of which resemble the facts of this case), and the citations provided by government, the court is not persuaded that the VA's beneficiary authorizations constituted unilateral contracts accepted upon

performance.

The court notes, too, that nothing in the VA's conduct when issuing the beneficiary authorizations indicated an intent to enter into numerous individual unilateral contracts acceptable upon performance. Pls.' Opp. at 36-41. More formal contracting mechanisms were available for obtaining dialysis services from plaintiffs via contract; indeed, according to the complaint, formal contracts of this nature were already in place between at least some of the plaintiffs and the VA. Compl. ¶ 3. Later, when the underpayment dispute arose, the VA's conduct again indicated that plaintiffs and the VA were not bound by contract with respect to dialysis services obtained through the beneficiary authorizations identified in the complaint. *See* Pls.' Opp. at 45 ("The VA's specified remedial process [for the alleged underpayments] bore no relation to a contract adjustment or to a CDA disputes and appeal process."). Based on the foregoing analysis, the conditions of unilateral contract formation have not been shown to have been present here.

### 3.      The VA Did Not Procure Services under the Contract Disputes Act by Issuing Beneficiary Authorizations

Despite the clear dichotomy between authorizations and contracts presented in section 17.56, and notwithstanding the total absence of any indicia of contractual procedures when the VA administered the beneficiary authorizations for dialysis services, the government contends that plaintiffs' suit is barred because no claim was filed with a VA contracting officer before plaintiffs filed their suit in this court. *See* Def.'s Mot. at 35 ("Because the dialysis centers' acceptance of VA purchase orders by performance resulted in contracts, in the absence of plaintiffs' submission of proper claims and a contracting officer's final decision on such claims, this Court now lacks jurisdiction to entertain plaintiffs' claims."). The court disagrees with defendant's contention because even if the elements of contract formation could be viewed as having been met here, such contracts, in this instance, were not procurement contracts subject to the Contract Disputes Act and its jurisdictional prerequisites.

As plaintiffs note, defendant has failed to demonstrate how the "unilateral contracts" alleged to have been formed by the VA's beneficiary authorizations are procurement contracts:

> Defendant . . . never establishes that the individual
> authorizations at issue in the Complaint were actually
> issued and administered as procurement contracts . . . .
> Certainly, that a series of procurement regulations
> governs federal agency procurement contracts does not,
> *ipso facto*, render the authorizations at issue in this
> Complaint procurement contracts themselves.

Pls.' Opp. at 34.  The inquiry, then, is whether any putative contracts based upon the beneficiary authorizations issued by the VA to individual veterans would be *procurement* contracts to which the CDA applies.  In the court's view, defendant's assumption that any such unilateral contracts for dialysis services would be procurement contracts is flawed.

Not all contracts to which the United States is a party are procurement contracts.  *See, e.g.*, *G.E. Boggs & Assocs., Inc. v. Roskens*, 969 F.2d 1023, 1026 (Fed. Cir. 1992)  ("Not all government contracts, however, fall within the Contract Disputes Act." (citing *Coastal Corp. v. United States*, 713 F.2d 728, 730 (Fed. Cir. 1983))).  Contracts "within the purview of the Contract Disputes Act . . . must be for the direct procurement of goods or services by an executive agency of the government."  *Id.* at 1027-28 (citing *New Era Constr. v. United States*, 890 F.2d 1152, 1157-58 (Fed. Cir. 1989); *Tatelbaum v. United States*, 749 F.2d 729, 730 (Fed. Cir. 1984)).  The term "procurement," for purposes of defining a contract subject to the CDA, has recently been discussed by the Federal Circuit:

> Congress defined "procurement" when it established the
> Office of Federal Procurement Policy, which oversees
> the direction of federal procurement policies,
> regulations, and procedures. *Distributed Solutions Inc.
> v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008)
> (citing 41 U.S.C. §§ 401-20).  Specifically, 41 U.S.C.
> § 403(2) states that "'procurement' includes all stages of
> the process of acquiring property or services, beginning
> with the process of determining a need for property or
> services and ending with contract completion and
> closeout."  41 U.S.C. § 403(2).  This court has relied on
> this definition for procurement on multiple occasions.

33

> *See Res. Conservation Grp. LLC v. United States*, 597
> F.3d 1238, 1244 (Fed. Cir. 2010); *Distributed Solutions*,
> 539 F.3d at 1345.  While those cases involved defining
> the term, "procurement," in the context of the Court of
> Federal Claims' jurisdictional statute, the Tucker Act, we
> discern no reason that undermines the applicability of the
> definition to the portion of the Contract Disputes Act
> that defines the [Civilian Board of Contract Appeals']
> jurisdiction.

*Rockies Express Pipeline LLC v. Salazar*, 730 F.3d 1330, 1336 (Fed. Cir. 2013).

This court has noted that a FAR provision adds further clarity to the definition of "procurement" provided by 41 U.S.C. § 403(2):[12]

> [The FAR] equat[es] "procurement" with "acquisition,"
> which "begins at the point when agency needs are
> established and includes the description of requirements
> to satisfy agency needs, solicitation and selection of
> sources, award of contract, contract financing, contract
> performance, contract administration, and those technical
> and management functions directly related to the process
> of fulfilling agency needs by contract[.]"

*ViroMed Labs., Inc. v. United States*, 87 Fed. Cl. 493, 501 n.11 (2009) (quoting 48 C.F.R. § 2.101(b)(2) (2013)).  The remaining portion of FAR 2.101, which also defines acquisitions and procurements in text that has not changed since the 2008 version of the FAR, states in relevant part:

> Acquisition means the acquiring by contract with
> appropriated funds of supplies or services (including
> construction) *by and for the use of the Federal
> Government* through purchase or lease . . . .

48 C.F.R. § 2.101 (2008) (emphasis added); *see New Era*, 890 F.2d at 1157

---

[12]/  41 U.S.C. § 403(2) has been recodified at 41 U.S.C. § 111 (2012).

(stating that "the acquisition by purchase, lease or barter, of property or services for the *direct benefit or use* of the Federal Government . . . characterizes a Federal procurement.") (citation and internal quotation omitted).

To trigger the jurisdictional prerequisites of the CDA, the alleged "unilateral contract" dispute in this court must have arisen from procurement contracts, rather than non-procurement contracts. *See* 41 U.S.C. §§ 7102(a)(2), 7104(b)(1); *Rockies Express*, 730 F.3d at 1336; *G.E. Boggs*, 969 F.2d at 1026-28. Because the CDA does not define "procurement," *Rockies Express*, 730 F.3d at 1336, the court relies on 41 U.S.C. § 111 and FAR 2.101 to define a procurement, *id.*; *ViroMed*, 87 Fed. Cl. at 501 n.11, as well as relevant caselaw. Pursuant to these authorities, a procurement contract is an acquisition for property or services for the direct benefit or use of the federal government. *See supra*. Here, the dialysis services authorized by the VA with the VA Form 10-7079's were for the direct benefit and use of individual veterans, not the VA. In the court's view, therefore, these authorizations, should they be construed to be unilateral contracts, could not have been procurement contracts to which the CDA applied.[13]

To further discern whether a contract is a procurement contract or some other kind of contract, it is helpful to examine cases which have distinguished this court's general contract jurisdiction, 28 U.S.C. § 1491(a)(1), from its CDA jurisdiction over procurement contract disputes, *id.* § 1491(a)(2).[14] One such case is *Arbitraje Casa de Cambio, S.A. de CV. v. United States*, 79 Fed. Cl. 235 (2007), which is somewhat analogous to this case.

The facts as alleged in *Arbitraje* were as follows. The plaintiffs in *Arbitraje* were Exchange Houses in Mexico which, in the past, lost money due to the purchase of fraudulent United States Postal Service (USPS) money orders. The plaintiffs then met with the USPS four times in order to craft an agreement regarding the continued redemption of USPS money orders by the plaintiffs.

---

[13]/ The court does not doubt that formal contracts between plaintiffs and the VA for the provision of dialysis services to veterans referred by the VA would be subject to an entirely different analysis.

[14]/ Some of these cases are concerned, instead, with the jurisdiction of boards of contract appeals to hear CDA disputes, rather than this court's CDA jurisdiction. 41 U.S.C. §§ 7104(a), 7105 (2012).

Later, the plaintiffs sued in this court alleging a breach of that agreement by the USPS.  The government moved to dismiss the case on the basis that the plaintiffs had failed to submit a claim to a contracting officer before filing suit, as required by the CDA.

The court described the contractual allegations of the plaintiffs as follows:

> Here, assuming the alleged facts are true, the Government and the Exchange Houses entered into a contract whereby the Exchange Houses would resume cashing money orders in exchange for the Government's promise to repay the reclaimed money.  The Exchange Houses cash the money orders on behalf of payees, and the USPS is not directly involved in the transaction.  When a payee receives a USPS money order, it presents that document to an Exchange House, which purchases it for a fee.  The payee endorses the money order over to the Exchange House, and the payee leaves with cash.  The Exchange House then forwards the money order to its partner bank in the United States.  The partner bank presents the money order to the Federal Reserve Bank for credit, and then credits the Exchange House's account for the value of the money order.

*Arbitraje*, 79 Fed. Cl. at 240.

The government characterized the alleged contract in *Arbitraje* as "an agreement by Plaintiffs to continue accepting and processing USPS money orders in exchange for reimbursements for reclamations already made."  79 Fed. Cl. at 239.  As such, the government argued that "the alleged contract was for the procurement of services and, therefore, bound by the CDA."  *Id.*  The court disagreed, because although the USPS received a benefit from the alleged contract, the contract was not for the direct benefit or use of the government.  *Id.* at 240 (citing *United States v. Winstar Corp.*, 518 U.S. 839 (1996)).  The court described the payments and services addressed by the alleged contract in this manner:

> It is clear that the USPS receives a benefit from the
> Exchange Houses' roles in the postal money order
> system. The standard for CDA procurement contracts,
> however, states that the procurement of services must be
> "for the direct benefit or use of the Federal
> Government." The Exchange Houses' role in the USPS
> money order system directly benefits the payees; the
> Exchange Houses, for a fee, convert the money order
> into cash for the payee. The role of the Exchange
> Houses as it relates to the Government is indirect. It
> takes one more step, the forwarding of the money order
> to the U.S. partner bank, for the Federal Government to
> again be engaged in the USPS money order process.

*Id.* (citing *New Era*, 890 F.2d at 1157).

Although the facts of the money order reclamation dispute in *Arbitraje* are different than the beneficiary authorization payment dispute in this case, there is one similarity worth noting. In each case, there was a direct beneficiary of the alleged contractual arrangement, but that direct beneficiary was not the government. In *Arbitraje*, it was the payee of a money order; here, it was the veteran receiving dialysis treatment. As in *Arbitraje*, any contracts for dialysis services in this case are not procurement contracts subject to the CDA. *DaVita*, 110 Fed. Cl. at 80-81.

In *G.E. Boggs*, to provide another example of government contracts that are not procurement contracts, a contractor attempted to litigate a dispute over contracts performed in and for Syria before the Armed Services Board of Contract Appeals (ASBCA). 969 F.2d at 1024-26. Although the United States Agency for International Development (AID) eventually adopted the contracts to close them out, the essential nature of the contracts with Syria showed another example in which the claimant had not entered into a procurement contract subject to the CDA:

> Boggs's contracts also do not fall within the purview of
> the Contract Disputes Act because such contracts must
> be for the direct procurement of goods or services by an

37

> executive agency of the government. . . .  Boggs directly
> contracted with Syria to build the waterworks.  The AID
> administrator never contracted to receive such a water
> system; AID's mandate was to terminate the contracts
> after Congress cancelled monetary assistance to Syria.

*Id.* at 1027-28 (citations omitted).  The Federal Circuit specifically noted that
"[t]he AID administrator did not enter into the adoption agreements with Boggs
for the purpose of procuring any goods or services for an executive agency of the
federal government."  *Id.* at 1027.  Because the ASBCA lacked CDA jurisdiction
over the dispute, the case was transferred to this court, presumably to resolve the
dispute under this court's general contract jurisdiction, not its CDA jurisdiction.
*Id.* at 1028.  *G.E. Boggs*, therefore, must again be read to require that a
procurement contract have the purpose of directly obtaining property or services
for an executive agency to fall with the jurisdictional ambit of the CDA.

    The court has considered the parties' arguments regarding the applicability
of the CDA to this suit.  The court has also considered the VA's administration of
the beneficiary authorizations and payments for dialysis services under section
17.56.  Finally, the court has examined the definition of "procurement contract"
provided by 41 U.S.C. § 111, FAR 2.101, *Rockies Express*, *G.E. Boggs*, *New Era*,
and *Arbitraje*.  Based on the evidence of record and relevant law, the court
concludes that even if unilateral contracts were formed between plaintiffs and the
VA, as defendant alleges, these contracts were not procurement contracts to which
the CDA applies.  Defendant's arguments based on procurement statutes and the
CDA fail to invalidate this court's jurisdiction over plaintiffs' claims.

### D.    The Government's Non-Jurisdictional Challenges to the Complaint

    The government raises two non-jurisdictional challenges to plaintiffs'
claims, one more fully developed than the other.  First, defendant asserts that
VAAR 801.601(c) and VAAR 801.670-3 invalidate any of plaintiffs' claims that
are based on beneficiary authorizations that obligated the United States to pay
more than $10,000.  Def.'s Mot. at 5, 37-38; Def.'s Reply at 24-25.  Second,
defendant argues that some of the veterans who obtained the dialysis services
identified in the complaint were not eligible for such services under 38 U.S.C.

§ 1703 and 38 C.F.R. § 17.52; thus, any claims for underpayment of dialysis services for those veterans are invalid.  Def.'s Mot. at 23.  These arguments which were brought, presumably, under RCFC 12(b)(6), have no merit.

### 1.    Authorizations for More than $10,000 in Dialysis Services

VAAR 801.670-3 describes when non-VA "medical . . . services under $10,000 per authorization" may be authorized by the VA, and by whom.  48 C.F.R. § 801.670-3(a).  VAAR 801.601(c) largely focuses on contracting authority within the VA.  As the court has discussed *supra*, however, the VAAR contracting regulations cited by defendant, VAAR 801.601(c) and VAAR 801.670-3, have not been shown to be applicable to the beneficiary authorizations at issue in plaintiffs' claims.  Thus, any cap on contracting authority in these regulations has not been shown to also limit the amount the VA could authorize with VA Form 10-7079's which specify payment under section 17.56.

Because defendant's arguments in this regard are somewhat cursory, the court has also considered the other VAAR regulations cited by defendant for its jurisdictional arguments, VAAR 813.307(c) and VAAR 853.213.  These regulations may be read to contain limits on contractual authority, including limits on the use of VA Form 10-7079's.  These regulations, however, have also not been shown to apply to the beneficiary authorizations issued by the VA to plaintiffs. *See supra*.  Having considered all of the VAAR regulations alluded to by the government, the court does not find that plaintiffs' claims which are based on authorizations for more than $10,000 in dialysis services lack plausibility so as to merit dismissal under RCFC 12(b)(6).[15]  *Iqbal*, 556 U.S. at 678.

### 2.    Dialysis Services for Veterans Not Eligible for Services under 38 U.S.C. § 1703

Defendant also contends that its "very preliminary inquiry [shows that] a substantial portion of the payments to plaintiffs during the relevant period . . . are based on dialysis services provided to veterans not eligible for services in accordance with the provisions of 38 U.S.C. § 1703 and 38 C.F.R. § 17.52."

---

[15]/  The court did not rely on materials outside of the pleadings for this ruling.  *See* RCFC 12(d).

Def.'s Mot. at 23.  In other words, if certain veterans were not eligible for services under 38 U.S.C. § 1703 and section 17.52, defendant reads section 17.56 as not providing any authorization for payment to plaintiffs for dialysis services for those veterans during the Relevant Period.  In the government's view, "[t]he Court should dismiss plaintiffs' claims . . . to the extent that they seek compensation on the basis of services they provided to veterans not eligible for services under 38 U.S.C. § 1703 and 38 C.F.R. § 17.52 (2009)."  *Id.* at 23-24.

Plaintiffs do not meet this argument head-on, but state that the parties are bound, at this stage of the litigation, by favorable inferences that must be accorded to the factual allegations of the complaint.  Pls.' Opp. at 14 n.9.  Among the citations to the complaint provided by plaintiffs in this footnote to their opposition brief, the most pertinent factual allegation is as follows:

> During the Relevant Period, Fresenius Plaintiffs provided such non-contracted Dialysis Services to VA beneficiaries predicated upon (a) the VA's payment obligation under 38 C.F.R. § 17.56; and (b) the VA's *representations*, as evidenced by the VA beneficiary authorizations, that the respective veteran met the requirements of 38 C.F.R. § 17.52(a) and was eligible for such non-contracted care under and in accordance with 38 C.F.R. § 17.56.

Compl. ¶ 23 (emphasis added).  This statement falls far short of a factual allegation that all of the veterans served by plaintiffs during the Relevant Period were eligible for services under 38 U.S.C. § 1703 and 38 C.F.R. § 17.52.  Thus, the court cannot conclude, after reviewing all of the paragraphs of the complaint cited by plaintiffs, *see* Pls.' Opp. at 14 n.9 (citing Compl. ¶¶ 2, 3, 23, 27), that the complaint alleges that all of plaintiffs' claims are for dialysis services provided to veterans eligible for services under 38 U.S.C. § 1703 and 38 C.F.R. § 17.52.

Although plaintiffs suggest that "[t]he Complaint alleges Plaintiffs provided dialysis services to veterans eligible for non-VA service[s] under Section 17.52," Pls.' Opp. at 14 n.9 (citing Compl. ¶¶ 2, 3, 23, 27), it would be more accurate to state that the complaint is silent as to veteran eligibility under 38 U.S.C. § 1703 and 38 C.F.R. § 17.52 for the dialysis services performed by plaintiffs during the

Relevant Period.  Thus, it is not correct to state that there is any allegation in this regard that "must be taken as true at this stage of the case."  Pls.' Opp. at 14 n.9.  Instead, plaintiffs have alleged only that the VA's beneficiary authorizations *stated* that the veterans in question met eligibility requirements under sections 17.52 and 17.56.  Compl. ¶ 23.

This analysis, however, does not compel dismissal of any of plaintiffs' claims under RCFC 12(b)(6).  There is nothing set forth currently within the pleadings which would support defendant's dismissal request, only a reference in the government's motion to dismiss reporting the results of the government's "very preliminary inquiry."  Def.'s Mot. at 23.  For the government to obtain dismissal of any of plaintiffs' claims based on veteran ineligibility under 38 U.S.C. § 1703 and 38 C.F.R. §§ 17.52, 17.56, a more robust argument would be required.  In that regard, defendant would be obliged to rely upon evidence outside of the pleadings to establish veteran ineligibility for services under section 17.56 and could no longer rely upon RCFC 12(b)(6).  *See* RCFC 12(d).  In the court's view, defendant's request for RCFC 12(b)(6) dismissal of some of plaintiffs' claims, on the ground that certain veterans were ineligible for plaintiffs' dialysis services under 38 U.S.C. § 1703 and 38 C.F.R. §§ 17.52, 17.56, is inadequately supported and premature.

For the foregoing reasons, none of plaintiffs' claims have been shown to lack the requisite plausibility under RCFC 12(b)(6).  *Iqbal*, 556 U.S. at 678.

## CONCLUSION

Accordingly, it is hereby **ORDERED** that:

(1)    Defendant's Motion to Dismiss, filed May 5, 2014, is **DENIED**; and

(2)    On or before **January 30, 2015**, the government shall **FILE** its **Answer** to the complaint.

/s/Lynn J. Bush
LYNN J. BUSH
Senior Judge